# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Daniel DeAntonio, Special Agent with Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION AND BACKGROUND INFORMATION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the FBI Tucson Resident Agency, Tucson, Arizona. I have been a Special Agent since January, 2019. I am currently assigned to investigations involving crimes in Indian Country, which includes attempted murder and aggravated assault. I have investigated these types of crimes during my career with the FBI. The statements contained in this Affidavit are based on my experience and background as a Special Agent and on information provided by other FBI Agents and law enforcement agents.

2. I submit this application and affidavit in support of a search warrant authorizing a search of the SUBJECT VEHICLE further described in **Attachments A** and **B**, incorporated herein by reference, which is located in the District of Arizona. Located within the SUBJECT VEHICLE and the RESIDENCE to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the SUBJECT VEHICLE and the RESIDENCE, including any computer and computer media located therein where the items specified in **Attachment B** may be found, and to seize all items listed in **Attachment B** as contraband and instrumentalities, fruits, and evidence of crime.

3. The statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this investigation that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; and my experience, training and background as a Special Agent with the FBI. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact

known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

4. To my knowledge, no prior attempt by investigative or legal process has been submitted to obtain the same or similar information sought in this warrant application. The target of the investigation is likely unaware of the existence of this investigation, has not been contacted, and therefore has made no statements to the effect that he would preserve the original data in lieu of seizure.

## PROBABLE CAUSE

5. On 06/06/2024, FBI Tucson Resident Agency received information from TFO Detective Christian Ralls from the Pascua Yaqui Tribal Police Department. TFO Ralls advised that on 06/06/2024, at approximately 2311hrs, an unknown male shot at I. C. (hereinafter referred to a Victim 1), date of birth 2009, in the area of 5160 Toroko Vampo, which is located on the Pascua Yaqui Indian Reservation. The unknown male was the passenger in a black Mercedes vehicle (hereinafter referred to as SUBJECT VEHICLE). FBI processed the scene and collected twelve (12) 7.62 shell casings. The casings were in the roadway and at the start of the northern residence's property.

6. Victim 1 was interviewed on scene and explained a black Mercedes drove by his residence, 5160 Toroko Vampo, multiple times prior to the shooting. Victim 1 explained that they were sitting outside at the box (power box), and observed the SUBJECT VEHICLE driving by. the SUBJECT VEHICLE kept driving by. The SUBJECT VEHICLE stopped and the person in the car asked him to come over. Victim 1 told everyone else to go inside. When Victim 1 went up to the SUBJECT VEHICLE, the driver, who was a female, told him to go to the other side. When Victim 1 went to the other side the male in the passenger seat pulled out an AK-47 and started shooting. Victim 1 described the SUBJECT VEHICLE as a black Mercedes. Victim 1 knew it to be a Mercedes because of the logo on the front. When the vehicle stopped, it stopped just east of his house's driveway, and was facing east. When Victim 1 went around to the passenger's side he saw the AK-47. It was a male with curly hair holding the AK-47. The

male's hair was like an "afro," but he was light skinned. There was another male in the back of the car. He had curly hair too but not as curly as the male in the passenger seat. This male's hair was shorter. The driver was a female. Victim 1 said the passenger who shot at him was probably 17 years old. Victim 1 stated he never saw him before. When Victim 1 saw the AK-47, the male then cocked it. Victim 1 hid behind the back of the SUBJECT VEHICLE and the passenger started to shoot. Victim 1 did not hear any doors but heard the windows go down. Victim 1 ran toward the cemetery (west) and then cut down the alley. Victim 1 thought he heard about 10 shots and Victim 1 could hear the rounds go by him. Victim 1 thought that bullets went down the road (west). Victim 1 described the AK-47 as having a wooden stock and handle. The other parts of the gun were black. The magazine for the AK-47 was curved and looked like a regular banana clip. Victim 1 explained he had never seen the SUBJECT VEHICLE before but explained it looked like a race car. The female driver did not call Victim 1 over by name. The female looked like she was 16 years old and was a little bit younger than the male. The female was short and was wearing shorts with a shirt over her shoulder. The female was medium build and there was nothing else he remembered about her. Victim 1 explained SUBJECT VEHICLE s Mercedes logo in the grille of the car was lit up. Victim 1 did not know anyone who had a Mercedes and explained the SUBJECT VEHICLE was newer. The SUBJECT VEHICLE was loud and sounded like it had a straight pipe (no or modified muffler). Victim 1 clarified that the male that shot was Mexican, skinny, and tall. Victim 1's brother F. C. (hereinafter referred to as Witness 1), date of birth 2011, was present when the SUBJECT VEHICLE drove by, prior to the shooting.

7. Witness 1 was also interviewed on 06/07/2024. Witness 1 explained that SUBJECT VEHICLE drove past them and then stopped while his brother (Victim 1), friend and himself were at the green box. The people in the SUBJECT VEHICLE said something and Victim 1 told the people in the SUBJECT VEHICLE to get out of here. the SUBJECT VEHICLE came back again and Victim 1 told Witness 1 to go back inside. After Witness 1 went inside he heard about 10 shots. Witness 1 described the SUBJECT VEHICLE as

a Mercedes that had a glowing logo on the front of the car. the SUBJECT VEHICLE was newer and was black. The driver of the SUBJECT VEHICLE was a female, and the passenger was a male with curly hair. There was a person in the back seat, and they were wearing a mask that only showed their eyes. The mask was black. Witness 1 described the female as wearing a pink or white dress. The female's hair was black and blonde, and her face was kind of chubby. Witness 1 described her face as being Asian, but she was white. Witness 1 described the male passenger with the curly hair as having dark skin like his. Witness 1 never saw the SUBJECT VEHICLE before. The SUBJECT VEHICLE stopped east of their driveway and was facing east. Witness 1 explained the passenger with curly hair had it cropped and together. Witness 1 explained he would be able to identify the passenger if he saw a photo of him. The passenger was sticking out of the front passenger window and was sitting on the rolled down window, with his head out of the SUBJECT VEHICLE. The passenger was wearing all black and had jacket on. The passenger in the back was wearing a hat. Witness 1 could not see the license plate, but recalled it being black with white numbers. Witness 1 believed that the shooter lived on the south side of Tucson. Witness 1 explained that Victim 1 used to text the shooter and that Victim 1 had beat the shooter up before. Witness 1 did not know his name but thought Victim 1 said "Art" or "Art Packs" when the SUBJECT VEHICLE drove by. Witness 1 explained that Victim 1 was scared of the shooter and that's why he didn't want to say anything. Witness 1 explained that Victim 1 fought Art at Spectrum and did not know if police came. After Witness 1 heard the shots, he ran outside. the SUBJECT VEHICLE was driving away. Witness 1 ran down the street to the west. While running Witness 1 heard two more shots.

8. J. G.-F. (hereinafter referred to as Witness 2), date of birth 2010, was interviewed on 06/07/2024. Witness 2 explained that they were just standing by the box. The SUBJECT VEHICLE kept passing by them, back and forth. Witness 2 explained that the SUBJECT VEHICLE was a Mercedes. The logo on the SUBJECT VEHICLE was lit up and the car was black. When the SUBJECT VEHICLE drove by the first time, it was driving at a

normal speed. When it drove by the second time, it was driving slowly. The SUBJECT VEHICLE sounded normal. After hearing the shots, Witness 2 went outside. They all started running down the road. Witness 2 remembered a female was driving and there was a male in the passenger. The female's hair was back, and she was Mexican or white. She appeared to be medium build. Witness 2 could only see her face. The male had curly hair, but he did not know who they were. Witness 2 couldn't really see their faces.

9. A. B. (hereinafter referred to as Witness 3), date of birth 2004, was interviewed on 06/11/2024. Witness 3 explained that a guy was driving around in Pascua Yaqui, in a black Mercedes. This guy drove up on Witness 3's friend Aaron. The people in the Mercedes were driving in and around Pascua Yaqui. The people also shot at people on the reservation. Witness 3 believed they were around 19 to 20 years old. The people in the Mercedes were part of a gang called OTBG. Witness 3 did not know what OTBG stood for, and explained that they were Mexican and black. Witness 3 did not know who shot from the Mercedes, but his friend Aaron did. Aaron sent Witness 3 a photo of the person that pulled up onto him (Aaron) on the reservation. Aaron told Witness 3 that the person in the Mercedes showed him a gun. The gun that was shown to Aaron was the same gun that was in the photo Aaron sent Witness 3. The person from the photo Aaron sent Witness 3 showed a younger, light skinned male, with curly hair. When they rolled up on Aaron there were other people in the Mercedes. Witness 3 stated OTBG were off the reservation but may be Pascua Yaqui members. Witness 3 did not know if Victim 1 knew who the shooter was. Witness 3 doesn't know Victim 1 and Witness 1 that well and just started hanging out with them. Witness 3 agreed to send the photos that Aaron had sent him. A description of the photos are below.

- Photo 1 depicts a male holding what appears to be a rifle. The male had a cropped type of haircut and he is standing in front of a red brick house with bars over a window. The

male is wearing a black shirt with white writing, blue pants, a white belt, and white colored shoes. The front of a black Mercedes vehicle can also be seen.



- Photo 2 depicts a male holding what appears to be a black handgun. The male had a cropped type of haircut and he is standing inside a room with a refrigerator and some type of door. A black rifle, which appears to be a AK-47 style rifle, can be seen leaning against the wall. The male is wearing a black shirt with white writing, blue pants, a white belt, and white colored shoes.



- Photo 3 depicts a male holding what appears to be a AK-47 style rifle, with a banana type magazine. The male had a cropped type of haircut and he is standing in front of a red brick house with bars over a window. The male is wearing a black shirt with white writing, blue pants, a white belt, and white colored shoes. The front of a black Mercedes vehicle can also be seen.

24-06316MB



10. The photos appeared to be from an Instagram account with the user name of "hopoutart". The Instagram account was located and viewable. A post from the user showed a black Mercedes bearing temporary tag 274927U. A query of AZ MVD for this temporary tag found it was associated with Arturo Garcia DOB: 05/11/1969 and was the **SUBJECT VEHICLE**, a black 2018 Mercedes Benz CLA. An open source query of Arturo Garcia found a relative named **Arturo Garcia Hernandez** (hereinafter referred to as ARTURO) DOB: 12/06/2005. A query of AZ MVD revealed an AZ driver's license with a picture that visually matched the user of the Instagram account.

Name: **Arturo Garcia Hernandez**
DOB: 12/06/2005
SSN: 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
AZ DL: D07735838

A related Instagram account with username "**art.packk**" was also identified and a screenshot of that account is below.





11. A preservation request was submitted for both accounts on 06/12/2024, under Meta Case # 8736496.

12. A search for ARTURO was conducted and it showed he had an involvement with Tucson Police Department (TPD) on 06/09/2024, for a Domestic Violence incident. ARTURO was not at the scene when TPD arrived. According to reports, ARTURO physically assaulted his girlfriend K. M., date of birth 2005, at 5525 S Mission Road, Apt 3201. Also present during this TPD incident was her roommate I. G. I. G. was the person who called 911. ARTURO had a stop and arrest flag placed on him.

13. On 06/12/2024, I. G. was interviewed by FBI Agents. I. G. explained that ARTURO was her roommate K. M.'s boyfriend. ARTURO had stayed at the apartment and had just recently had a domestic incident with K. M. I. G. explained that ARTURO had pointed a

gun at their apartment in the past. I. G. described the gun as being a black colored AK-47. I. G. provided phone number 520-565-7715 as ARTURO's phone number. ARTURO and K. M. drove around all day and sold weed. That was how ARTURO made his money. I. G. explained that last week, ARTURO and K. M. went to do a sale on the Pascua Yaqui Indian Reservation. While doing the sale, ARTURO shot his AK-47 at someone, and K. M. was driving the Mercedes. I. G. confirmed that ARTURO drove and owned a black Mercedes. ARTURO took the AK-47 and all the money when he left I. G.'s apartment on 06/09/2024, before the police arrived. I. G. believed that ARTURO has the AK-47 with him. I. G. was sure the AK-47 was not in her apartment. I. G. knew ARTURO to also have a handgun. I. G. confirmed that ARTURO had an I-Phone 15 and he used it to facilitate his drug deals. It was also how ARTURO communicated.

14. On 06/12/2024, TPD Officers located the SUBJECT VEHICLE, within the city limits of Tucson. TPD Officers observed a male in the passenger seat that matched ARTURO's description. TPD was able to confirm ARTURO was in fact in the passenger seat. TPD had an active arrest warrant for ARTURO, related to the 06/09/2024 Domestic Violence incident. TPD Officers followed the SUBJECT VEHICLE to 1205 E Greenlee Road, Tucson, AZ. TPD Officers observed ARTURO exit the vehicle and enter into Unit #7 (hereinafter referred to as the RESIDENCE). TPD SWAT Team arrived and called ARTURO out of the RESIDENCE. After some time ARTURO exited the RESIDENCE and was arrest by TPD. ARTURO did not have any weapons or cell phones on his person. The RESIDENCE is a second story apartment with an unknown number.

**TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS**

15. Based on my training and experience, as well as discussions with other experienced law

enforcement officers and witnesses, I have learned that:

  a. Many modern motor vehicles are equipped with sensors, cameras,[1] transmitters, and electronic control units (ECUs)[2] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.[3] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

  b. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit

---

[1] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

[2] "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

[3] The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

    and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

  c. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

  d. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed or brakes were engaged.

  e. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia

  navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

 f. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

 g. I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously-connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

 h. As previously stated, the SUBJECT VEHICLE is a 2018 Black , Mercedes Benz CLA VIN WDDSJ4EBXJN676666, bearing Arizona registration plate AEA89W. To complete a forensic extraction from the SUBJECT VEHICLE, it may be necessary, temporarily, to remove trim and other components of the SUBJECT VEHICLE to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic

  processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the SUBJECT VEHICLE. In the event that potentially destructive processes are required to perform this extraction, parts of the SUBJECT VEHICLE may be destroyed and rendered useless.

i. Furthermore, it may be necessary to return to the SUBJECT VEHICLE and reconnect the infotainment and telematics systems to the SUBJECT VEHICLE's power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

j. The requested warrant authorizes a later review of the media and information seized or copied from the SUBJECT VEHICLE, which review may continue past the date required for execution of the warrant.

## CONCLUSION

16. I submit that this affidavit supports probable cause for a warrant authorizing the search of the SUBJECT VEHICLE and extraction and forensic examination of electronically stored information within the SUBJECT VEHICLE (as described in Attachment A) to seize the data described in Attachment B. Also, the search for any ammunition, casings, firearms, firearm parts, firearm accessories, receipts of firearm purchases, and cell phones. This affidavit also supports probable cause to search the RESIDENCE for the items withing Attachment B. Further, as TPD officers have arrested ARTURO and are standing by the

24-06316MB

location of the RESIDENCE and have secured the SUBJECT VEHCILE, I respectfully submit there is reasonable cause to execute this search warrant at any time. The items and data will provide evidence related to the crimes involving Attempted Murder, in violation of Title 18 United States Code 1113 and Assault with a Dangerous Weapon, in violation of Title 18 United States Code 113(a)(1).

Respectfully Submitted,

DANIEL DEANTONIO
Digitally signed by DANIEL DEANTONIO
Date: 2024.06.12 21:57:17 -07'00'

_____
Special Agent Daniel DeAntonio
Federal Bureau of Investigation

Subscribed and sworn telephonically on this 12th day of June, 2024

_____
Honorable Lynnette Kimmins United States Magistrate Judge